**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TIMOTHY PHALON, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:19-CV-00852 (JCH) |
| v. | : | |
| | : | |
| AVANTOR INC. and VWR | : | |
| INTERNATIONAL LLC, | : | SEPTEMBER 30, 2021 |
| Defendants. | : | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 58)**
**AND RELATED MOTIONS (DOCS. NOS. 68, 74)**

**I.      INTRODUCTION**

Plaintiff Timothy Phalon ("Phalon") brings this action against Avantor, Inc.

("Avantor") and VWR International, LLC ("VWR"), alleging five counts of employment

discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

("ADA"), the Connecticut Fair Employment Practices Act, CONN. GEN. STAT. § 46a-58 et

seq. ("CFEPA"), and the Family Medical Leave Act, 29. U.S.C. § 2601 et seq. ("FMLA").

Avantor and VWR have moved for summary judgment on all claims.  See Defs.'

Mot. for Summ. J. (Doc. No. 58); Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ.

J. ("Defs.' Mem.") (Doc. No. 60); Defs.' Reply Mem. of Law in Further Supp. of Defs.'

Mot. for Summ. J. ("Defs.' Reply") (Doc. No. 73).  Phalon opposes this Motion.  See

Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ J. ("Pl.'s Mem.") (Doc. No. 69).

Phalon has also filed a Motion for Leave to File Excess Pages, and defendants have

filed a Motion to Seal.  See Request for Permission to Exceed the Page Limit with

Respect to Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. ("Mot. for Excess Pages")

(Doc. No. 68); Defs.' Mot. to Seal Hotel Accident Report, Police Report, and Medical

1

Records Excerpts ("Mot. to Seal") (Doc. No. 74).  Neither of these two motions is opposed.

For the reasons discussed below, the court grants the defendants' Motion for Summary Judgment.  It also grants plaintiff's Motion for Leave to File Excess Pages nunc pro tunc, as well as Defendants' Motion to Seal. Exhibits 18, 19, 21, and 38 to defendants' Motion for Summary Judgment (Docs. Nos. 61-17, 61-18, 61-20, and 61-37) are hereby sealed, and defendants are ordered to file within seven (7) days of this Ruling copies of exhibits 18 and 19 on the record with private details redacted.

## II.    FACTS[1]

This case arises from an incident that took place late in the night on April 25, 2018, and into the early morning hours of April 26.  Defs.' R. 56(a)1 Stmt at ¶¶ 31, 35-36; Pl.'s R. 56(a)2 Stmt at ¶¶ 31, 35-36.   Plaintiff Phalon, a Senior Sales Representative for VWR, was attending the Biomarke Sales Conference at the College Park Marriott Hotel and Conference Center in Maryland.  Defs.' R. 56(a)1 Stmt at ¶¶ 28-29; Pl.'s R. 56(a)2 Stmt at ¶¶ 28-29.  After a night of "dining and entertainment," Phalon returned to his room, fell, and struck his head.  Defs.' R. 56(a)1 Stmt at ¶¶ 31, 35; Pl.'s R. 56(a)2 Stmt at ¶¶ 31, 35.  Sometime afterwards, Phalon's roommate at the conference returned to the room and found him unconscious.  Defs.' R. 56(a)1 Stmt at ¶ 36; Pl.'s R.

---

[1] The court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts, construing those facts in the light most favorable to Phalon.

However, the court also notes issues with the Rule 56(a) statements submitted by each of the parties.  Defendants initially submitted a Rule 56(a)1 Statement conforming to the 12 page limit in Rule 56(a)1.  See Defs.' Local R. 56(a)1 Statement of Undisputed Material Facts ("Defs.' R. 56(a)1 Stmt") (Doc. No. 59); D. Conn. L. Civ. R. 56(a)1.  In response, however, plaintiff exceeded the page limit in Rule 56(a)2 by 10 pages.  See Pl.'s Resp. to Defs.' Statement of Facts in Opp'n to Mot. for Summ. J. ("Pl.'s R. 56(a)2 Stmt") (Doc. No. 69-1); D. Conn. L. Civ. R. 56(a)2(i) (limiting the portion of a Local Rule 56(a)2 Statement responding to the movant's Local Rule 56(a)1 Statement to "no longer than twice the length" of the Local Rule 56(a)1 Statement).  Plaintiff also exceeded the page limit in the "Additional Material Facts" section of his Local Rule 56(a)2 Statement by six pages, which plaintiff erroneously labels his "Local Rule 56(a)(3) Statement."  See Pl.'s Local R. 56(a)(3) Statement of Additional Material Facts ("Pl.'s Additional Material Facts") (Doc. No. 69-2); D. Conn. L. Civ. R. 56(a)2(ii) (limiting the Additional Material Facts section of a Local Rule 56(a)2 Statement to nine pages).  In response, and without leave of court, defendants then filed a response to plaintiff's additional material facts.  See Defs.' Resp. to Pl.'s Local R. 56(a)(3) Statement of Additional Material Facts ("Defs.' Reply to Pl.'s Additional Material Facts") (Doc. No. 73-1).  Taken together, plaintiff has exceeded his page limits by 16 pages, while defendants have filed a reply to plaintiff's additional material facts that is not authorized by the rules.

Despite these deficiencies, the court will, in its discretion, still consider each of these documents to the extent that they set forth material facts that are supported by evidence in the record.  While the court appreciates that plaintiff felt he needed additional pages in both sections of his Rule 56(a)2 Statement, and defendants believed they needed to reply to what they viewed as plaintiff's "insufficient" additional material facts, each party should have moved for leave of this court before doing so.  Defs.' Reply to Pl.'s Additional Material Facts at 2.  Still, the court will consider each of these submissions in the interest of "secur[ing] the just, speedy, and inexpensive determination of [this] action," and because, in reviewing the statements, the court determines that both parties were making a good-faith effort to present facts to the court and litigate their case.  Fed. R. Civ. Pro. 1.

56(a)2 Stmt at ¶ 36.  Four days later, Phalon's employment with VWR was terminated, and this lawsuit ensued.  Defs.' R. 56(a)1 Stmt at ¶ 96; Pl.'s R. 56(a)2 Stmt at ¶ 96.

Phalon had begun working for VWR on or around March 17, 2015.  Defs.' R. 56(a)1 Stmt at ¶ 1; Pl.'s R. 56(a)2 Stmt at ¶ 1.  He primarily worked out of his home office in Watertown, Connecticut, but traveled frequently to visit with clients and prospective customers in his territory of western Massachusetts, Connecticut, and Rhode Island.  Defs.' R. 56(a)1 Stmt at ¶¶ 8-12; Pl.'s R. 56(a)2 Stmt at ¶¶ 8-12.  In 2017, Avantor acquired VWR. Defs.' Ex. 9 at 2 (Doc. No. 61-9); Pl.'s Additional Material Facts at ¶ 1.  After the acquisition, the "combined company" maintained "[t]he VWR brand and vwr.com as a selling channel," and kept "the full collection of VWR brands . . . available through existing channels."  Defs.' Ex. 10 at 2 (Doc. No. 61-10).

Throughout his time at VWR, Phalon experienced issues with his knee.  Although this did not prevent him from carrying out his job duties – which "did not require him to stand for extended periods of time" – Phalon testified that he did have to accommodate his knee in order to work.  Defs.' R. 56(a)1 Stmt at ¶ 18; Pl.'s R. 56(a)2 Stmt at ¶ 18.  For instance, his knee would "lock up" during longer drives, which would require him to stop and "walk around a parking lot" to loosen it up.  Dep. of Timothy Phalon, Defs.' Ex. 2 at 169 (Doc. No. 61-2).  He also testified that "walking" and "basic movements" were "painful," and that working from home was "uncomfortable."  Id. at 169, 181.

Still, Phalon was able to continue doing his job, and there is nothing in the record indicating that he formally requested accommodations from his employer.  He did, however, take several steps to alleviate his discomfort.  He used ibuprofen, cortisone shots, attended physical therapy, and even began wearing a knee brace to cope with

the pain.  Id. at 168-69, 179, 181, 183.  Still, his condition got progressively worse.  Id.

at 173.  He was "in pain . . . most of the time."  Id.  His knee was "occasionally . . .

buckling" and he was "limping."  Id.  In early 2018, his "surgeon recommended knee

replacement."  Id. at 174, 182.  At that point, Phalon reached out to Sarah Murray

("Murray"), a Human Resources Business Partner, to ask about "any information on

short term disability benefits, as [he would] be having knee replacement surgery

sometime th[at] year."  Defs.' Ex. 14 at 3 (Doc. No. 61-14); Defs.' R. 56(a)1 Stmt at ¶ 25;

Pl.'s R. 56(a)2 Stmt at ¶ 25.  She responded to his March 22, 2018 email that same

day, providing the requested details – including information on opening a "FML (family

medical leave) claim."  Defs.' Ex. 14 at 3.  She also forwarded the email to Phalon's

supervisor, Bob Dearth ("Dearth").  Id. at 2.  Plaintiff never followed up on this email or

formally requested such leave before his employment was terminated.[2]  Defs.' R. 56(a)1

Stmt at ¶ 26-27; Pl.'s R. 56(a)2 Stmt at ¶ 26-27.

Phalon also testified to a history alcohol addiction.[3]  Pl.'s Additional Material

Facts at ¶¶ 73-74; Dep. of Timothy Phalon, Defs.' Ex. 2 at 118-27; Aff. Of Timothy

---

[2] In his deposition, Phalon stated that he "had been consulting with [his] doctor and surgeon, and [had decided to get the knee replacement surgery] in the beginning of 2018.  And we originally set a date for July."  Dep. of Timothy Phalon, Defs.' Ex. 2 at 182.  He points to this statement in his responses to paragraphs 26 and 27 of defendants' Rule 56(a)1 Statement.  Pl.'s R. 56(a)2 Stmt at ¶¶ 26-27.  However, although his deposition testimony provides evidence upon which a reasonable jury could conclude he had scheduled the surgery before his employment was terminated, there is nothing in the record indicating he informed his employer of a specific date, nor is there evidence that he followed up on his March 22, 2018 email to formally request leave.

[3] In the Additional Material Facts section of his Rule 56(a)2 Statement, Phalon states that he has been diagnosed with Alcohol Abuse Disorder [sic].  Pl.'s Additional Material Facts at ¶ 73.  In response, defendants argue that the evidentiary support Phalon offers for this claim – an unsigned report from Margaret Chaplin, M.D., dated November 9, 2020 – is hearsay.  Defs.' Reply to Pl.'s Additional Material Facts at ¶ 73.  In that report, Dr. Chaplin opines that Phalon "suffers from the illness of Alcohol Use Disorder."  Am. Report of Dr. Margaret Chaplin, Pl.'s Ex. Q at 3 (Doc. No. 69-5) (emphasis added).

Even assuming arguendo that Dr. Chaplin's report is admissible, Phalon has not brought forth evidence of an Alcohol Use Disorder diagnosis before November 9, 2020.  He has, however, in both his

Phalon, Pl.'s Ex. B at ¶ 24 (Doc. No. 69-3).  In his deposition, he stated that his "issue[s]" with alcohol had begun in "early adolescence" and continued "throughout [his] life."  Dep. of Timothy Phalon, Defs.' Ex. 2 at 118.  His addiction had affected his marriage, and he had a DUI in 1994.  Id. at 118, 121.  Over time, Phalon had developed "coping mechanism[s] [for his] addiction and recovery," and he testified that his alcohol issues never affected his work at VWR.  Id. at 123; Pl.'s Additional Material Facts at ¶ 74.  However, there is no evidence in the record indicating that Phalon had discussed his addiction with anyone at VWR or Avantor prior to the Biomarke conference.

Phalon arrived at the Park Marriott Hotel in Maryland for the Biomarke conference, scheduled to take place from April 23-26, 2018.  Defs.' R. 56(a)1 Stmt at ¶ 28; Pl.'s R. 56(a)2 Stmt at ¶ 28.  The conference allowed invited VWR sales professionals to receive training on company products and connect with product suppliers.  Defs.' R. 56(a)1 Stmt at ¶ 29; Pl.'s R. 56(a)2 Stmt at ¶ 29.  The first two nights were uneventful.  After the business lectures, there were events where food, soft drinks, and alcohol were available.  Defs.' R. 56(a)1 Stmt at ¶ 30; Pl.'s R. 56(a)2 Stmt at ¶ 30.  These events were held at the hotel, and Phalon went directly back to his room at the end of his night.  Dep. of Timothy Phalon, Ex. 2 at 124.

On Wednesday, the third and final night of the conference, defendants hosted the post-lecture event offsite at a venue in Washington, D.C. called Pinstripes.  Defs.' R. 56(a)1 Stmt at ¶ 31; Pl.'s R. 56(a)2 Stmt at ¶ 31.  The parties dispute the nature of the event.  Phalon testified that "[t]here were several open bars" and that "it was kind of a

---

deposition testimony and his Affidavit, presented admissible evidence of his history of alcohol abuse, even if there is no evidence before the court that it had been diagnosed at or before the time relevant to this case.

partying atmosphere" where he felt "pressure to drink."  Dep. of Timothy Phalon, Defs.'
Ex. 2 at 61, 200.  He said he witnessed "people chugging drinks, people doing shots,"
and that throughout the night "there [were] a lot of people drinking heaving . . . a lot of
intoxication."  Id. at 126, 144.  Defendants, for their part, note that they provided
transportation to and from the event, and that Pinstripes had "buffet stations, bowling
and other games" in addition to "open bars."  Defs.' Rule 56(a)1 Stmt at ¶ 32.

What is clear is that, as the event was ending around 10:00 p.m., at least some
of the conference attendees decided to continue their night out and not return to the
hotel on the buses provided by defendants.[4]  Defs.' R. 56(a)1 Stmt at ¶ 33; Pl.'s R.
56(a)2 Stmt at ¶ 33; Aff. Of Timothy Phalon, Pl.'s Ex. B at ¶ 6; Dep. of Timothy Phalon,
Defs.' Ex. 2 at 67-68.  Phalon was invited to go to a nearby bar with several others,
where he stayed until shortly after 11:00 p.m.  Defs.' R. 56(a)1 Stmt at ¶ 33; Pl.'s R.
56(a)2 Stmt at ¶ 33; Dep. of Timothy Phalon, Defs.' Ex. 2 at 68-69.  He then took an
Uber back to the hotel.  Defs.' R. 56(a)1 Stmt at ¶ 33; Dep. of Timothy Phalon, Defs.'
Ex. 2 at 69.  As they got back to the hotel, someone in Phalon's group mentioned "an
after-work party in someone's room," and Phalon decided to go.  Dep. of Timothy
Phalon, Defs.' Ex. 2 at 71.  There were "approximately 15 to 20 people" at the party,
including his colleague Aaran McEneff ("McEneff").  Id.; Defs.' R. 56(a)1 Stmt at ¶ 34;

---

[4] There does, however, appear to be some dispute in the record as to the extent to which
conference attendees declined to return directly to the hotel at the end of the Pinstripes event.
Defendants concede that at least some did not return on the buses.  See Defs.' R. 56(a)1 Stmt at ¶ 33
(stating that, "[a]fter the Pinstripes event, Plaintiff reported going with some Conference attendees to a
nearby bar" and referencing pages in Phalon's deposition where he estimates that "between 10 and 20
people" went to the same bar as he did after the end of the Pinstripes event).  Defendants also cite to an
April 26 email from Mark Thornton ("Thornton") saying that "[e]veryone [was] accounted for and returned
to [the] hotel safely by 11pm."  Defs.' Ex. 16 at 2 (Doc. No. 61-50); Defs.' R. 56(a)1 Stmt at ¶ 32 (citing
Defs.' Ex. 16).  Plaintiff disputes Thornton's representation that "everyone was accounted for and put on
the bus," see Aff. Of Timothy Phalon, Pl.'s Ex. B at ¶ 6, and his denial is supported by his own testimony
and defendants' own admissions.

Pl.'s R. 56(a)2 Stmt at ¶ 34.  Phalon testified that he "didn't stay very long," and that he

went back to his room shortly after arriving.  Dep. of Timothy Phalon, Defs.' Ex. 2 at 71.

Upon returning to his room, he fell and struck his head.  Defs.' R. 56(a)1 Stmt at ¶ 35;

Pl.'s R. 56(a)2 Stmt at ¶ 35.  Around 1:00 a.m., his roommate Matt Queen ("Queen")

found him unconscious and bleeding from the back of his head.  Defs.' R. 56(a)1 Stmt

at ¶¶ 36-37; Pl.'s R. 56(a)2 Stmt at ¶¶ 36-37; Guest Accident/Illness Report No. 18-GAI-

8, Defs.' Ex. 18 at 2.  Phalon had "suffered a scalp laceration that required three

staples."  Defs.' R. 56(a)1 Stmt at ¶ 44; Pl.'s R. 56(a)2 Stmt at ¶ 44.

The amount that Phalon drank the night of the accident is a matter of dispute, as

is the degree to which his drinking contributed to his fall.  He "does not have a memory

of falling," and the police report states that Phalon told the officer "he had just consumed

too much alcohol."  Pl.'s R. 56(a)2 Stmt at ¶ 41; Def.'s Ex. 19 at 2 (Doc. No. 61-18).

However, Phalon denies having told the officer this, and accurately points to other

examples where the report is contradicted by evidence in the record to cast doubt on its

veracity.  Pl.'s R. 56(a)2 Stmt at ¶ 41.  He also notes that, while he did "smell[ ] of

alcohol," the records from the hospital state that he was "alert and oriented" and not

"clinically intoxicated."  Pl.'s R. 56(a)2 Stmt at ¶ 43, 45; Defs.' Ex. 21 at 7 (Doc. No. 61-

20).  Finally, he relies on the memory of the night from McEneff – who had seen him at

the after-party just prior to his fall – and who recalled him as "not exhibiting signs of

severe intoxication (stumbling, etc.)," although he had "definitely [been] drinking."  Pl.'s

R. 56(a)2 Stmt at ¶ 86; Defs.' Ex. 17 at 2 (Doc. No. 61-16).

Defendants, for their part, identify inconsistencies in Phalon's testimony as to

how much he drank.  First, they point to Thornton's initial email about the incident, in

which he states that Phalon "acknowledged that it was due to having drank too much [that] evening."  Defs.' Ex. 22 at 3 (Doc. No. 61-21).  They also cite deposition testimony from Murray, where she says Phalon admitted "[t]hat he was intoxicated.  That he had had many drinks."  Defs.' Reply to Pl.'s Additional Material Facts at ¶ 31; Dep. of Sarah Murray, Defs.' Ex. 12, at 47 (Doc. No. 61-12).  They then highlight that in his own deposition, Phalon appears to have given contradictory answers as to how much he drank throughout the course of the night.  See Defs.' Reply to Pl.'s Additional Material Facts at ¶ 41; Dep. of Timothy Phalon, Defs.' Ex. at 66-67 (stating that "[he] had the one beverage with Henry.  And, again, over the course of the evening, again, I had . . . approximately two more vodka clubs"); id. at 110-11 (testifying that he told Bob Gabe ("Gabe") he had "somewhere in the area of four to six drinks over the course of the entire evening").[5]

Construing these facts in the light most favorable to Phalon, it is undisputed that he drank some alcohol over the course of the evening, returned to his room around midnight, and fell and hit his head.  The next morning, Phalon attended the final day of the Biomarke conference as planned.  Defs.' R. 56(a)1 Stmt at ¶ 51; Pl.'s R. 56(a)2 Stmt at ¶ 51.  Shortly after 11:00 a.m., Thornton was notified of the incident by Marriott's Director of Security.  Defs.' R. 56(a)1 Stmt at ¶ 53; Pl.'s R. 56(a)2 Stmt at ¶ 53.  Kathy Thompson ("Thompson"), the event manager, then called Phalon out of the conference room to speak with her, Thornton, Queen, and Beth Lawler ("Lawler"), who was in

---

[5] Gabe's testimony on what Phalon told him the next morning does not appear to be entirely consistent either.  He first states that Phalon said he had had "seven alcoholic drinks" at the Pinstripes event, and that he "[did not] recall what they drank" after they returned to the hotel.  Dep. of Robert Gabe, Defs.' Ex. 26 at 46 (Doc. No. 61-25).  He goes on to testify that Phalon did "admit to [him that he] had [ ] seven drinks in about a two hour period and came back to the hotel and had several more."  Id. at 50-51.

defendants' marketing department.  Defs.' R. 56(a)1 Stmt at ¶¶ 54-56; Pl.'s R. 56(a)2

Stmt at ¶¶ 54-56.  Marriott's Director of Security was also present.  Defs.' R. 56(a)1

Stmt at ¶ 55; Pl.'s R. 56(a)2 Stmt at ¶ 55.  Thornton took the lead on the conversation,

and first asked Phalon if he was feeling okay.  Defs.' R. 56(a)1 Stmt at ¶ 57; Pl.'s R.

56(a)2 Stmt at ¶ 57.  He then asked further questions about the previous evening, and

Phalon returned to the conference afterwards.  Defs.' R. 56(a)1 Stmt at ¶¶ 55-61; Pl.'s

R. 56(a)2 Stmt at ¶ 55-61.  Thornton proceeded to send an email detailing this meeting

and the incident to Michael Mascali ("Mascali"), copying Bjorn Hofman ("Hofman"), the

COO of the combined company, and Mark McLoughlin ("McLoughlin"), the Executive

Vice President.  Defs.' R. 56(a)1 Stmt at ¶ 62; Pl.'s R. 56(a)2 Stmt at ¶ 62; Pl.'s

Additional Material Facts at ¶ 4; Defs.' Reply to Pl.'s Additional Material Facts at ¶ 4;

Dep. of Mark McLoughlin, Defs.' Ex. 11 at 18 (Doc. No. 61-11).  In that email, he

represented that Phalon had "acknowledged that . . . [he had] drank too much."  Defs.'

Ex. 22 at 3.

After Mascali responded to Thornton's email instructing him to "[p]lease

investigate ASAP," COO Hofman replied as well, saying that, "[a]t a first glance there

will be significant discipline," but that because "they report to [McLoughlin]," McLoughlin

would "ultimately . . . [be] the decision maker."  Id. at 2; see also Defs.' R. 56(a)1 Stmt at

¶ 63.[6]  Gabe, who worked in Human Resources, testified that, at McLoughlin's

instructions, he then began investigating the incident with Murray.  Dep. of Robert

---

[6] Plaintiff attempts to deny paragraph 63 in defendants' Rule 56(a)1 Statement by arguing that,
"in accordance with Defendants' policies . . . Plaintiff's manager was supposed to have a say in the
matter" as well.  Pl.'s R. 56(a)2 Stmt at ¶ 63.  Even assuming this is true, plaintiff has not brought forth
any evidence upon which a reasonable jury could conclude that, in this instance, McLoughlin did not have
"ultimate decision-making authority over Plaintiff's discipline."  Defs.' R. 56(a)1 Stmt at ¶ 63.

Gabe, Defs.' Ex. 26 at 29.  Since neither Gabe nor Murray were present at the hotel,
they set up a telephonic conference with Phalon on the final afternoon of the
conference.  Defs.' R. 56(a)1 Stmt at ¶¶ 66, 68; Pl.'s R. 56(a)2 Stmt at ¶¶ 66, 68.
Around 2:30 p.m., Lawler again called Phalon out of the conference and escorted him to
a banquet room to take the call.  Defs.' R. 56(a)1 Stmt at ¶ 67; Pl.'s R. 56(a)2 Stmt at ¶
67.

During the call, Gabe first asked Phalon if he was okay and what had transpired.
Defs.' R. 56(a)1 Stmt at ¶ 69; Pl.'s R. 56(a)2 Stmt at ¶¶ 69.  They then discussed how
much Phalon had drank the night before, and Gabe asked him if he could identify
anyone who had been with him at the after-party back at the hotel.  Defs.' R. 56(a)1
Stmt at ¶¶ 70, 72; Pl.'s R. 56(a)2 Stmt at ¶¶ 70, 72.  After Phalon provided information
about a person who turned out to be McEneff, Gabe asked him if he was able to travel.
Defs.' R. 56(a)1 Stmt at ¶¶ 73-74; Pl.'s R. 56(a)2 Stmt at ¶¶ 73-74.  Phalon said he
could, and when the conversation ended Gabe placed him on administrative leave,[7] and
Lawler escorted him to a taxi so he could return home.  Defs.' R. 56(a)1 Stmt at ¶¶ 74,
77-78; Pl.'s R. 56(a)2 Stmt at ¶¶ 74, 77-78.

 Throughout these discussions, Phalon testified that he "was just kind of
shocked, you know, at everything that was happening."  Dep. of Timothy Phalon, Defs.'
Ex. 2 at 112.  He had hit his head the night before and not gotten much sleep, and
"didn't know anybody [he] was dealing with" from the company throughout the day.  Id.

---

[7] Phalon attempts to deny that Gabe placed him on administrative leave during this conversation.
Defs.' R. 56(a)2 Stmt at ¶ 77.  However, the evidence he cites to does not support this denial, and in his
own deposition Phalon testified that "[Gabe] informed me that – I believe he informed me that I was on a
leave of absence at that point and should exit the premises, you know, right away."  Dep. of Timothy
Phalon, Defs.' Ex. 2 at 111.

When Lawler walked him to the taxi, he assumed she was part of Human Resources, because she had sat in on the call with Gabe and Murray.  Id. at 114.  As they walked from the banquet hall back through the lobby, Phalon testified that he was visibly limping, and that he mentioned his ongoing knee issues and upcoming surgery to Lawler, telling her "that this could very well have been, you know, the reason for my fall."  Id.  He had not mentioned his knee condition to Thornton, Gabe, or Murray in his earlier conversations that day.  Id. at 114-15.  And, while Murray had been notified of the issue approximately a month earlier when Phalon reached out to her to inquire about short-term disability benefits, she testified that by the time of this incident she had forgotten about that exchange.  Dep. of Sarah Murray, Defs.' Ex. 12 at 118-19.  Nor did Lawler – who was not involved in the decision-making regarding plaintiff's discipline beyond her actions described here at the conference – speak to Murray about her conversation with Phalon or remind her about his knee condition.  Id.

The next day, Murray interviewed Queen and McEneff about the incident.  Defs.' R. 56(a)1 Stmt at ¶ 83; Pl.'s R. 56(a)2 Stmt at ¶ 83.  Before finding him unconscious in their room around 1:00 a.m., Queen had last seen Phalon around 7:30 p.m.  Defs.' R. 56(a)1 Stmt at ¶ 84; Pl.'s R. 56(a)2 Stmt at ¶ 84.  McEneff originally did not know who Phalon was, but then recalled that he was "definitely drinking, but not exhibiting signs of intoxication (stumbling, etc.)" at the after-party.  Defs.' Ex. 17 at 2.  Murray testified that she did not seek a post-accident test or make an effort to get Phalon's hospital records during the investigation both "[b]ecause he said he was intoxicated," and because "so much time had passed . . . by the time we spoke to him . . . [that is was] a little late to have an alcohol test."  Dep. of Sarah Murray, Defs.' Ex. 12 at 138-39.

12

Based on this information, McLoughlin met with Gabe, Murray, and Deborah Poenisch ("Poenisch") at 2:30 p.m. on Friday, April 27, 2018, a day and a half after the incident. Defs.' R. 56(a)1 Stmt at ¶ 89; Pl.'s R. 56(a)2 Stmt at ¶ 89. At the meeting, McLoughlin informed Poenisch – who was the head of the sales organization within the company that Phalon was a part of – that he had decided to terminate his employment. Defs.' R. 56(a)1 Stmt at ¶¶ 89-90; Pl.'s R. 56(a)2 Stmt at ¶¶ 89-90. Dearth, Phalon's manager, was not involved in this meeting. Defs.' R. 56(a)1 Stmt at ¶ 92; Pl.'s R. 56(a)2 Stmt at ¶ 92. The stated reason was "unprofessional conduct due to overconsumption of alcohol at and after a company event." Defs.' R. 56(a)1 Stmt at ¶ 95.

Defendants did not, however, inform Phalon of their decision on Friday. Over the weekend, not having heard anything more about his administrative leave or further disciplinary action, Phalon emailed Murray. Defs.' R. 56(a)1 Stmt at ¶ 97; Pl.'s R. 56(a)2 Stmt at ¶ 97. In his email, he apologized "for [his] recent behavior." Defs.' Ex. 37. He continued:

> My behavior last week was atypical of who I am. I rarely drink and I have always conducted myself in a responsible and professional manner. I don't understand why I made the poor choices that I did. I can only promise you that this was an isolated incident that will never happen again. I am taking this very seriously. Upon returning home I took immediate action, attending AA meetings for the first time this week to gain more self-understanding and prevent this from happening again.

Id. Still, after discussing this email on Monday, McLoughlin decided that it "wasn't enough . . . to reverse the decision [he] had made." Dep. of Mark McLoughlin, Defs.' Ex. 11 at 136. That same day, he sent an email to the company's executives informing them of his decision, and at 4:30 p.m. Gabe and Dearth called Phalon to notify him that his employment had been terminated. Defs.' Ex. 41 at 3-4 (Doc. No. 61-40); Defs.' R. 56(a)1 Stmt at ¶ 104; Pl.'s R. 56(a)2 Stmt at ¶ 104.

13

III.    **STANDARD OF REVIEW**

A Motion for Summary Judgment will be granted if the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A genuine issue of material fact exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor. See, e.g., Biondo v. Kaledia Health, 935 F.3d 68, 73 (2d Cir. 2019) (citing Anderson, 477 U.S. at 248)).

IV.    **MOTION FOR EXCESS PAGES AND MOTION TO SEAL**

As a preliminary matter, the court addresses Phalon's Motion for Leave to File Excess Pages and defendants' Motion to Seal.

A.    Motion for Excess Pages

Phalon has moved for leave to file a 50 page Memorandum of Law in Opposition to defendants' Motion for Summary Judgment, exceeding the 40 page limit in Local Rule 7(a)5. Mot. for Excess Pages at 1; D. Conn. L. Civ. R. 7(a)5 ("[e]xcept by order of the Court, memoranda shall be . . . no more than forty . . . pages"). He argues that the addition pages are necessary due to the "long narrative of the facts with citations which will aid the Court" and the "complex[ity]" of the issues the Memorandum addresses. Mot. for Excess Pages at 1. Defendants do not oppose this Motion. Because the court acknowledges the complexity of both the fact pattern and legal issues before it, plaintiff's Motion for Leave to File Excess Pages is granted nunc pro tunc.

14

B.      Motion to Seal

Defendants have also moved to seal four exhibits filed in support of their Motion for Summary Judgment.  Mot. to Seal.  These include the hotel's accident report, Defs.' Ex. 18, the police report, Defs.' Ex. 19, and Phalon's medical records.  Defs.' Exs. 21, 38.  Phalon has not opposed this Motion.  Defendants argue that these documents should be sealed because they "contain[ ] sensitive personal information [about] Plaintiff and others."  Mem. of Law in Supp. of Defs.' Mot. to Seal at 1 (Doc. No. 74-1).  Specifically, the four documents collectively include "Plaintiff's medical records" and "the full dates of birth, home addresses, personal phone numbers, driver's license numbers, and ages of Plaintiff and other non-parties."  Id. at 3.

The court grants the Motion to Seal in part and denies it in part.  "The Second Circuit has instructed that 'documents submitted to a court for its consideration in a summary judgment motion are – as a matter of law – judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment.'"  Burns v. Rovella, et al., No. 3:19-CV-553, 2021 WL 4263372, at *7 (D. Conn. Sept. 20, 2021) (quoting Trump v. Deutsche Bank AG, 940 F.3d 146, 151 (2d Cir. 2019)).  A court determines if sealing is appropriate "on the basis of a careful document-by-document review of the particular portions of the document that a party wishes to be kept under seal and after considering whether the requested order is no broader than necessary to serve the interests that require protection."  Von Spee v. von Spee, No. 3:05-CV-1488, 2007 WL 9753045, at *1 (D. Conn. Aug. 23, 2007) (citing U.S. v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995)).  "[A] judicial document may be withheld from public access only if the court concludes that the presumption of public access – whose weight depends on the nature of the document – is outweighed by

15

'competing considerations' such as, e.g., privacy interests, public safety, or attorney-client privileged information."  U.S. v. Litvak, No. 13-CR-19, 2015 WL 328876, at *2 (D. Conn. Jan. 23, 2015) (quoting Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006)).  If a court determines that sealing is appropriate, it must make "'specific, on the record findings . . . demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'"  Litvak, 2015 WL 328876, at *2 (quoting In re New York Times Co., 828 F.2d 110, 117 (2d Cir. 1987)).

After "carefully and skeptically review[ing]" all four of the exhibits defendants have moved to seal, the court grants the Motion in full as to the two exhibits containing Phalon's medical records.  In re Orion Pictures Corp., 21 F.3d 24, 27 (2d Cir. 1994). "Courts have specifically recognized that there is a recognized privacy interest in medical records, albeit one that is neither fundamental nor absolute."  United States v. Vinas, No. 08-CR-823, 2017 WL 1969665, at *2 (E.D.N.Y. May 11, 2017) (internal quotations and citations omitted).  Here, the court finds that, because these two documents consist entirely of Phalon's private medical information, the privacy interest of keeping these records sealed outweighs the presumption of public access, and that sealing the documents is essential to preserving that interest.  See, e.g., Principal Nat. Life Ins. Co. v. Coassin, No. 13-CV-1520, 2015 WL 3466111, at *2 (D. Conn. June 1, 2015) (since the exhibits in question "consist wholly or substantially of information about [the movant's] health . . . sealing these documents is clearly warranted").  The Motion to Seal is therefore granted as to defendants' exhibits 21 and 38, and those exhibits will remain under seal.

As to the two exhibits containing the hotel and police reports, the court grants the Motion in part and denies it in part.  Although it agrees with defendants that the full dates of birth, home addresses, personal phone numbers, driver's license numbers, and ages of Plaintiff and other non-parties should be sealed, the information contained in these two reports is much broader than just that.  In particular, the case narratives in each of these reports provides a contemporaneous account of the incident that is the very subject of this lawsuit – accounts that the parties have relied on and disputed as they have developed the factual record now before this court.  See, e.g., Defs.' R. 56(a)1 Stmt at ¶ 35; Pl.'s R. 56(a)2 Stmt at ¶ 35 (disputing the accuracy of the hotel report); Defs.' R. 56(a)1 Stmt at ¶ 36; Pl.'s R. 56(a)2 Stmt at ¶ 36 (disputing Queen's statements reflected in the police report).

Because these documents provide crucial information that is "relevant to an[ ] issue [this court] need[s] to decide," and because the privacy interest in sealing the body of these reports – as opposed to the personal details contained elsewhere in the reports – is minimal, the court grants the Motion to Seal in part and denies it in part.  Trump, 940 F.3d at 151-52.  The unredacted versions of defendants' exhibits 18 and 19 will remain under seal, and defendants are ordered within seven (7) days of this Ruling to file versions of these two documents with full dates of birth, home addresses, personal phone numbers, driver's license numbers, and ages of Plaintiff and other non-parties redacted.

## V.   MOTION FOR SUMMARY JUDGMENT

Defendants have also moved for summary judgment on all five counts of plaintiff's Complaint.  First, they argue that Phalon has failed to establish an ADA or CFEPA discrimination claim because his knee condition is not a disability or a perceived

17

disability for the purposes of the ADA; his alcoholism is not a disability or a perceived

disability under the ADA or CFEPA; and, even if they were, Phalon has failed to bring

forth evidence upon which a reasonable jury could conclude that his employment was

terminated due to his knee condition or alcoholism or that the proffered reason for his

termination – unprofessional conduct at a work event – was pretextual.  Defs.' Mem. at

8-28.  Second, they argue that Phalon does not have a viable ADA or CFEPA retaliation

claim because he never engaged in any protected activity under the statutes, and even

if he had, he cannot demonstrate any causal connection between the protected activity

and the termination of his employment or that defendants' stated reason for terminating

him was mere pretext.  Id. at 28-33.  Finally, defendants contend that he does not have

a viable FMLA retaliation claim for similar reasons – namely, that he never exercised his

rights or engaged in a protected activity under the FMLA.  Id. at 34.  Phalon, in his

opposition to summary judgment, disagrees with each of these arguments.  Pl.'s Mem.

The court analyzes each of Phalon's claims in turn.

      A.     ADA and CFEPA Discrimination Claims (Counts One and Two)

ADA and CFEPA claims are analyzed under the familiar McDonnell Douglas

burden-shifting framework.  Preston v. Bristol Hosp., 645 F. App'x 17, 19 (2d Cir. 2016).

In order to prevail on his ADA and CFEPA discrimination claims, Phalon must first

"establish a prima facie case" that he was discriminated against due to his disability.

Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).  Once the

prima facie case has been established, the burden shifts to the employer to offer "a

legitimate non-discriminatory reason for the discharge."  Id.  If defendants are able to do

so, "the plaintiff must then produce evidence and carry the burden of persuasion that

the proffered reason is a pretext."  Id.

Establishing a prima facie case of discrimination "is not a demanding burden." DeAngelo v. Yellowbook Inc., 105 F.Supp.3d 166, 174 (D. Conn. 2015) (internal quotations and citations omitted).  To do so, "a plaintiff must show that: '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'"  Id. (quoting Sista, 445 F.3d at 169).  Phalon's CFEPA claim is analyzed under this same framework.  See DeAngelo, 105 F.Supp.3d at 180 ("[c]laims under the CFEPA are analyzed using the same burden shifting framework set forth by the Supreme Court in McDonnell Douglas").  "The only relevant difference between the analysis a court undertakes in regards to ADA and CFEPA claims is in defining

disability," as CFEPA's definition is "broader."[8]  Id.; see also Mancini v. Accredo Health
Group, Inc., 411 F.Supp.3d 243, 255 (D. Conn. 2019) ("[s]ince whether [plaintiff] is
disabled is not at issue here, the analysis of [her] CFEPA claim is the same as for the
ADA claim").

Here, defendants argue that Phalon has failed to even make a prima facie case,
both because his impairments – with the exception of his knee condition under the
CFEPA – do not rise to the level of disability under the statutes, and because he has not
brought forth evidence showing that his employment was terminated because of either
condition.  Defs.' Mem. at 8-20.  Phalon counters by pointing to the ADA Amendments
Act of 2008 (ADAAA), which he argues "broaden[ed]" the definition of disability under

---

[8] One other apparent divergence between the standard for ADA and CFEPA claims is whether an
employee is required to show that his disability was the "but-for" cause of the adverse employment action,
or merely that the disability was a "motivating factor" in that decision.  In Natofsky v. City of New York,
921 F.3d 337, 348 (2d Cir. 2019), the Second Circuit held that, for ADA claims, the former applied.
Following the Supreme Court's instruction in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009),
"the text of an anti-discrimination statute must expressly provide for a 'motivating factor' test before that
test can be applied."  Natofsky, 921 F.3d at 348.  Thus, the court held "that the ADA requires a plaintiff
alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any
adverse employment action."  Id.

Connecticut courts, however, have not been so clear.  "Since Gross . . . neither the Connecticut
Supreme Court nor the Connecticut Appellate Court has expressly addressed whether the 'motivating
factor' standard still applies to CFEPA claims."  Weisenbach v. LQ Management, No. 3:13-CV-01663,
2015 WL 5680322, at *7 (D. Conn. Sept. 25, 2015); see also DeAngelo, 105 F.Supp.3d at 181 (whether
Gross "affect[s] the causation standard of claims under the CFEPA has not been determined by the
Connecticut Supreme Court"); Mancini, 422 F.Supp.3d at 256 n. 3 ("[i]t remains unsettled whether
causation under the CFEPA is analyzed using the 'but-for' or 'motivating factor' standard").  Although
Connecticut courts have continued to "review federal precedent concerning employment discrimination for
guidance in enforcing [CFEPA]," they have also continued to apply the "motivating factor" standard for
such claims.  Phandis v. Great Expression Dental Centers of Connecticut, P.C., 170 Conn.App. 79, 86
(2017); id. at 90 ("the plaintiff is not required to show that the employer's proffered reasons were false or
played no role in the employment decision, but only that they were not the only reasons and that the
prohibited factor was at least one of the 'motivating' factors") (internal quotations and citations omitted).

Because the Connecticut Supreme Court has not yet applied the "but-for" standard since Gross,
and because it is axiomatic that "Connecticut is the final arbiter of its own laws," the court here applies the
"motivating factor" test to Phalon's CFEPA claims.  Weisenbach, 2015 WL 5680322, at *8-9 (internal
quotations and citations omitted).  However, as discussed infra at Sections IV.A.1 and IV.A.2, Phalon fails
to meet either standard because he has not provided any evidence upon which a reasonable jury could
conclude that his disability had a role in defendants' decision to terminate his employment.

the statute," and highlighting circumstantial evidence in the record he believes is sufficient to support an inference of improper motives on the part of defendants.  Pl.'s Mem. at 23, 34-44.

But even assuming arguendo that Phalon has made a prima facie showing of discrimination based on his disabilities,[9] the court still grants defendants' Motion for Summary Judgment as to his ADA and CFEPA discrimination claims because he has failed to introduce into the record any evidence demonstrating that defendants' proffered reasons for terminating his employment were pretextual, or that his disabilities were even a factor in that decision.  To do so, Phalon would have to "point to any evidence sufficient to permit a rational trier of fact to conclude" both that defendants' proffered "reason was false, and that discrimination was the real reason" his employment was terminated.[10]  Sanchez v. Connecticut Natural Gas Co., 421 F. App'x 33, 34 (2d Cir. 2011).  He has not met that burden as to either the alleged discrimination based on his knee condition or his alcoholism.

---

[9] In assessing "discrimination claims under the McDonnell Douglas framework, courts in the Second Circuit often assume without deciding that a prima facie case of age discrimination has been made, and decide the Motion based on the third prong of the test."  Weiss v. Quinnipiac University, No. 3:20-CV-00375, 2021 WL 4193073, at *5 n. 4 (D. Conn. Sept. 15, 2021).  This is because "[a] plaintiff who can prevail at the third stage of the McDonnell Douglas process [will have] necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on his/her claim whether or not there exist circumstances giving rise to an inference of discrimination.  Johnson v. Ultravolt, Inc., No. 13-CV-3518, 2015 WL 541519, at *4 (E.D.N.Y. Feb. 10, 2015).

[10] In his Memorandum, Phalon contends that the second step of the McDonnell Douglas analysis has not been met because defendants have not "[met] their burden to proffer a non-discriminatory reason for the termination."  Pl.'s Mem. at 45-47.  Their argument confuses the second step of the McDonnell Douglas analysis with the third.  Defendants have proffered a legitimate, non-discrimination reason for their actions – "unprofessional conduct due to overconsumption of alcohol at and after a company event" – a rationale that is consistently reflected throughout the record.  Defs.' Reply at 11.  Phalon's arguments to the contrary are all aimed at undermining that rationale and attempting to show it was mere pretext for discrimination.  See Pl.'s Mem. at 45-47.  Such arguments are appropriate for the third step of the McDonnell Douglas analysis.  Accordingly, the court holds that defendants have met their burden at step two, and considers Phalon's arguments therein as it conducts step three of the analysis.

1.    Knee Condition

As to Phalon's knee condition, he argues that "[m]any of Defendants' representatives were aware of Plaintiff's serious knee issues which had reached a point at which surgical intervention was recommended." Pl.'s Mem. 48. But, crucially, he has introduced no evidence into the record upon which a reasonably jury could conclude that his knee issues were ever discussed by defendants in their conversations that lead to his termination – let alone that his knee condition motivated their decision in any way. Construing the facts in the light most favorable to Phalon, as the court must do at this stage, he has brought forth evidence demonstrating that Murray, Lawler, and Dearth were all aware of his knee issues. Pl.'s R. 56(a)2 Stmt at ¶ 93. Murray became aware of his condition approximately a month before the Biomarke conference when Phalon reached out to ask about "any information on short term disability benefits, as [he would] be having knee replacement surgery sometime th[at] year." Defs.' Ex. 14 at 3. Dearth, Phalon's direct supervisor, learned of his knee condition that same day, when Murray forwarded along his email. Id. at 2. And Lawler, who escorted Phalon from the hotel to the taxi after he was placed on administrative leave, was notified when Phalon told her about his ongoing issues as they walked and stated that it "could very well have been, you know, the reason for [the] fall." Dep. of Timothy Phalon, Defs.' Ex. 2 at 112.

"Mere knowledge," of course, "does not give rise to an inference of discrimination or retaliation" even at the prima facie stage. Yetman v. Capital Dist. Transp. Auth., 669 Fed. App'x 594, 595 (2d Cir. 2016). And Phalon cannot demonstrate anything beyond mere knowledge. Although Murray was involved in the conversations that led to the decision to terminate Phalon, she testified under oath that, by the time of the incident she had forgotten about his single email the month prior. Dep. of Sarah Murray at 118-

19, Defs.' Ex. 12.  Phalon has not introduced evidence to the contrary, nor has he introduced evidence upon which a reasonable jury could conclude that she informed McLoughlin or Gabe about his condition during the investigation into the incident at the conference.  As for Dearth and Lawler, neither of them were involved in the decision-making process that led to the termination of Phalon's employment, and there is no evidence in the record suggesting that they shared their knowledge about his knee condition with anyone else in the company.  See Pl.'s R. 56(a)2 Stmt at ¶ 93 (acknowledging that Dearth was "exclud[ed] . . . from the situation" but arguing his exclusion was improper under defendants' policies); supra at 11 (describing Lawler's actions at the hotel on April 27, but finding no evidence in the record that she was involved any further in the decision-making process over Phalon's discipline).

In sum, Phalon has not "point[ed] to any evidence sufficient to permit a rational trier of fact to conclude" that defendants' proffered explanation for the termination of his employment was pretext, or that his knee condition factored into that decision in any way.  Sanchez, 421 F. App'x at 34 (2d Cir. 2011).

2.    Alcoholism

Similarly, Phalon has failed to introduce evidence upon which a reasonable jury could find that his alcoholism was a motivating factor in defendants' decision to terminate his employment.  In his Memorandum, Phalon makes two separate arguments to the contrary, neither of which are persuasive.  First, he contends that his "termination occurred due to Defendants' perception that [he] had a substance use issue."  Pl.'s Mem. at 48.  "Once they thought he was an alcoholic," this argument goes, "he was treated like a pariah and rushed through the termination in violation of [defendants' company] policies."  Id.  The second argument builds on the first.  It points

to what Phalon characterizes as "substantial circumstantial evidence . . . [in the record] to show pretext (i.e. deviation from policies, inconsistent actions, shifting positions, abrupt and rushed decisions, deceptive/dishonest statements, [and] disparate treatment of other employees who admitted to being under the influence") the night of the Pinstripes event.  Id. at 47.

Phalon primarily relies on two pieces of evidence to argue that defendants perceived him to have an alcohol abuse problem.  First, he points to the deposition of Gabe, who recommended to McLoughlin that Phalon's employment be terminated. Dep. of Robert Gabe, Defs.' Ex. 26 at 122.  Gabe testified that, following the incident, he "believe[d] [Phalon] had an alcohol abuse problem, yes," even though Phalon had "said to [him] that he did not."  Id. at 84.  Gabe "perceived he needed help.  [He] felt bad for [Phalon].  He fell down and [Gabe] believe[d] alcohol was a primary reason he did and [ ] was trying to help."  Id. at 82.  Gabe shared this impression with Eric McAllister, his boss and the Executive Vice President of Human Resources, and told Phalon he could seek assistance through the Employee Assistance Program.  Id. at 24, 82, 150. Second, Phalon highlights his email on Sunday, April 29, where he stated he had "attend[ed] AA meetings for the first time" after the incident as evidence that Murray and McLoughlin were also aware of his alcoholism.  Defs.' Ex. 37; Pl.'s Mem. at 28-29. From Gabe's testimony and this email, Phalon argues that "a jury could easily conclude that Plaintiff's termination occurred due to Defendants' perception that Plaintiff had a substance use issue."  Pl.'s Mem. at 48.

But this argument ignores the consistent practice of courts in this Circuit, "in ADA cases involving alcoholism and illegal drug use," of "recogniz[ing] the distinction

between disability-caused conduct and disability itself as a cause of termination."
Vanderbroek v. PSEG Power Connecticut, L.L.C., No. 3:07-CV-869, 2009 WL 650392,
at *5 (D. Conn. Mar. 10, 2009), aff'd, 356 F. App'x 457 (2d Cir. 2009).  Even assuming
that defendants perceived Phalon to be an alcoholic when they decided to terminate his
employment, plaintiff has not brought forth evidence upon which a reasonable jury could
conclude that this perception – as opposed to his "unprofessional conduct" at the
conference – motivated their decision, or that their proffered reason for his termination
was pretext.  Defs.' R. 56(a)1 Stmt at ¶ 88.

   "[T]he ADA specifically permits employers to 'hold an employee . . . who is an
alcoholic to the same qualification standards for employment or job performance and
behavior that such entity holds other employees, even if any unsatisfactory performance
or behavior is related to the . . . alcoholism of such employee.'"  Vandenbroek, 356 F.
App'x at 459 (quoting 42 U.S.C. § 12114(c)(4)).  The ADA thus "authorizes discharge
for misconduct that is caused by a disability in cases involving alcoholism and illegal
drug use."  Vandenbroek, 2009 WL 650392 at *5.  "Further . . . employers are not
required to make any reasonable accommodations for employees who are illegal drug
users or alcoholics."  Id.

   Following this logic, this court granted summary judgment in Vandenbroek for the
plaintiff's employer.  Id. at *6.  In that case, the record showed that plaintiff "had been an
untreated alcoholic for more than twenty-seven years, including the sixteen years he
was employed by PSEG."  Id. at 3.  After he missed work multiple times due to his
drinking, he admitted to a co-worker he had a drinking problem.  Id. at *2.  PSEG
conducted an investigation into the "no call/no show" incidents, during which plaintiff told

PSEG "he was temporarily unavailable to . . . [participate] because he was receiving treatment for his alcoholism." Id.  Once plaintiff was able to participate in the investigation, it proceeded, and PSEG ultimately decided to terminate his employment "for his repeated violation of the no call/no show policy." Id. at 3.  Though PSEG was clearly aware of his substance abuse issue, the court still found that "[t]here [was] no evidence that [the] decision to terminate [plaintiff] was based on anything other than his two violations of the no call/no show policy or that the decision was based on [his] alcoholism or treatment for alcoholism." Id.

Similarly, in Klaper v. Cypress Hills Cemetery, No. 10-CV-1811, 2014 WL 1343449 (E.D.N.Y. Mar. 31, 2014), aff'd, 593 F. App'x 89 (2d Cir. 2015), the court was confronted with a situation where the plaintiff had "suffer[ed] a 'breakdown' over the weekend during which he 'drank a little.'" Klaper, 2014 WL 1343449 at *1.  The next week, he "failed to report to work on three consecutive days and was terminated" by his employer. Id.  After his union representative intervened, plaintiff signed a "last chance stipulation," accepting a three-month suspension during which he was required "to seek and complete treatment for his alcoholism." Id.  Once he completed his treatment, however, he suffered a relapse and failed to report back to work until five days after he was required to in accordance with the agreement. Id. at *1-2.  His employment was then terminated. Id. at *2.

In granting summary judgment for plaintiff's employer on his ADA discrimination claim, the Klaper court rejected plaintiff's argument that he could "establish pretext by arguing that his breach of the ["last chance stipulation"] [was] traceable to his alcoholism." Id. at *8.  Though defendants clearly knew about his substance abuse

problem, the Second Circuit upheld the district court's decision by noting that plaintiff had "fail[ed] to demonstrate that the resulting adverse employment action was related to his alcoholism rather than a consequence of his failure to return to work pursuant to the stipulation."  Klaper, 593 F. App'x at 90.

The situation here is analogous to both Vandenbroek and Klaper: construing the facts in the light most favorable to Phalon, in all three cases the defendant-employer was aware of the plaintiff's alcoholism.  In all three cases, the employer's proffered reason for terminating the plaintiff's employment was "disability-caused conduct," not the "disability itself."  Vanderbroek, 2009 WL 650392 at *5.  Thus, because Phalon has not brought forth evidence upon which a reasonable jury could conclude that defendants' given reasons were pretext, nor has he brought forth evidence that his alcoholism was even a factor in their decision to terminate his employment, defendants are entitled to summary judgment on his ADA and CFEPA discrimination claims.

Phalon's second argument, that the circumstantial evidence in the record is sufficient for a rational trier of fact to conclude that defendants' proffered reason for his termination was mere pretext for discrimination, does not change this conclusion.  In particular, Phalon argues that defendants failed to follow their established procedures, made inconsistent and inaccurate statements while "shifting positions" throughout the course of the investigation, and did not investigate or discipline other employees who admitted to being under the influence the night of the Pinstripes event.  Pl.'s Mem. at 47.  But "[w]hile [this court] must ensure that employers do not act in a discriminatory fashion, [it does] not sit as a super-personnel department that reexamines an entity's business decisions."  Delaney v. Bank of America Corp., 766 F.3d 163, 169 (2d Cir.

2014) (internal quotations and citations omitted).  Although Phalon argues that the investigation did not produce sufficient evidence demonstrating that alcohol was the reason for his fall, courts "'are decidedly not interested in the truth of the allegations against [the] plaintiff.'"  <u>Mancini</u>, 411 F.Supp.3d at 252 (quoting <u>McPherson v. New York City Dept. of Educ.</u>, 457 F.3d 211, 216 (2d Cir. 2006)).  In other words, "'the factual validity of the underlying imputation against the employee is not at issue'; rather, the relevant question is 'what <u>motivated</u> the employer.'"  <u>Mancini</u>, 411 F.Supp.3d at 252 (quoting <u>McPherson</u>, 457 F.3d at 216) (emphasis in original).  At this stage, the court must assume that Phalon's account of how much he drank and his explanation for the fall is correct.  But even then, it is the motivations of his employer that matter.  And Phalon has not provided evidence upon which a reasonable jury could conclude that defendants' proffered reason for terminating his employment was pretext for discriminatory animus.

Defendants have provided legitimate, non-discriminatory reasons for the actions they took during the investigation.  For instance, Phalon makes much of the fact that McLoughlin had originally stated that the investigation would follow "proper process" and involve part of the company known as Environmental Health, Safety, and Sustainability ("EHS&S").  Pl.'s Mem. at 14-15 (misstating the name of EHS&S); <u>see also</u> Dep. of Mark McLoughlin, Defs.' Ex. 11 at 123 (providing the correct name).  The next day, he backtracked and decided an EHS&S investigation was not necessary because they had determined the incident was alcohol induced and not a safety violation and, according to Thornton and Gabe, Phalon had acknowledged that he had drank too much the night before.  Dep. of Mark McLoughlin, Defs.' Ex. 11 at 121-23.

Phalon offers no admissible evidence to rebut this explanation and simply speculates that the decision not to involve EHS&S was due to McLoughlin's fear that "the safety issues surrounding the [Pinstripes] event would likely not be 'well-received'" by management, and so rather than permit a full investigation to proceed, McLoughlin precipitated "a dramatic shift in the plan."  Pl.'s Mem. at 15.  Similarly, defendants say they did not conduct any investigations into other employees based on the Pinstripes event for the simple reason that "it is undisputed that no other alcohol-related incidents were reported, much less anything as serious as Plaintiff's incident."  Defs.' Mem. at 27.  Plaintiff has offered no evidence upon which a jury could reasonably find that this explanation was pretext.

Thus, taken together, Phalon has produced no evidence upon which a reasonable juror could conclude that his alcoholism was a factor in the decision to terminate his employment, or that defendants' proffered legitimate reason for doing so – unprofessional conduct – was pretextual.

### 3.    Conclusion

For the reasons stated above, the court grants defendants' Motion for Summary Judgment as to Counts One and Two of plaintiff's Complaint.

### B.    ADA and CFEPA Retaliation Claims (Counts Three and Four)

Retaliation claims under the ADA and CFEPA are analyzed using the same McDonnell Douglas framework described above.  See supra Section V.A; Koenig v. City of New Haven, No. 16-CV-514, 2018 WL 1440175, at *3 (D. Conn. Mar. 21, 2018) ("[c]ourts analyze claims of discrimination and retaliation pursuant to [the ADA and CFEPA] by applying the same burden-shifting framework").  In order to establish a prima facie case of retaliation under the ADA and CFEPA, Phalon "must show: '(1) he

engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity.'" Id. at *9 (quoting Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002); see also Frantti v. New York, 850 F. App'x 17, 21 (2d Cir. 2021) (quoting Treglia to articulate the same standard).

Defendants argue that Phalon has failed to establish a prima facie case because "he never engaged in any protected activity for either" his knee condition or alcoholism. Defs.' Mem. at 28.  Phalon offers just a brief paragraph in response, citing no case law but asserting that both his March 22 email notifying Murray he would need knee surgery and his April 29 email mentioning AA constituted protected activities.  Pl.'s Mem. at 48-49.  The court here agrees with defendants and concludes that Phalon has not established a prima facie case of retaliation because he did not engage in a protected activity.  Even if he had, Phalon's retaliation claims would still fail because – like his discrimination claims discussed above – he has not introduced evidence establishing any causal connection between his decision to engage in these protected activities and defendants' decision to terminate his employment.

An employee engages in a protected activity if they "complain[ ] of discrimination [or] seek an accommodation" for their disability.  Frantti, 850 F. App'x at 21 (citing Treglia, 313 F.3d at 720, and Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 149 (2d Cir. 2002).  "Complain[ing] of discrimination" refers to "formal or informal complaints protesting or opposing statutorily prohibited discrimination."  Frantti, 850 F. App'x at 21; Mendillo v. Prudential Ins. Co. of Am., 156 F.Supp.3d 317, 344 (D. Conn. 2016).

Phalon does not allege that he protested some form of discrimination and instead appears to argue that his emails sought accommodation for his disabilities.

His argument fails because Phalon did not actually request an accommodation in either of his emails.  On March 22, he emailed Murray about his knee.  The body of the email read, in its entirety: "I hope that you are doing well.  I was looking for any information on short term disability benefits, as I will be having knee replacement surgery sometime this year.  Thank you."  Defs.' Ex. 14 at 3.  He never followed up on this email, nor did he actually request leave or notify defendants when his surgery would take place.  As the Second Circuit has held, such a cursory email lacking any specific request for accommodation is not sufficient to establish that a plaintiff engaged in a protected activity.  For instance, in <u>Frantti</u>, the Second Circuit affirmed the district court's decision to grant summary judgment for the employer on an ADA discrimination and retaliation claim.  In doing so, it observed that the plaintiff's email to human resources "asking to explore the possibility of a work schedule that would permit plaintiff to start later in the morning, since the mornings were the times when his stomach was 'most distressed,'" was insufficient to establish that the plaintiff had "requested these accommodations from his employer."  <u>Frantti v. New York</u>, 414 F.Supp.3d 257, 280 (N.D.N.Y. 2019); <u>Frantti</u>, 850 F. App'x at 20.  Because he had only sent a single email and "identifie[d] nothing in the record showing that he followed up after Human Resources directed him to online information about New York's policies and provided him with a copy of the application," his email was not considered a protected activity.  In the same way, Phalon's March 22 email merely requesting information does not rise to

the level of a protected activity for the purposes of establishing a prima facie retaliation case under the ADA or CFEPA.

The same is true of his April 29 email apologizing "for [his] recent behavior." Defs.' Ex. 37.  Although Phalon does mention he attended "AA meetings for the first time," nowhere does he request any accommodation for his alcoholism from defendants.  Moreover, the Second Circuit has been clear that when "adverse job actions began well before plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise" and the fourth prong of the prima facie retaliation test is not met.  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001); see also Perez v. City of New York, 843 F. App'x 406 (2d Cir. 2021) (finding a prima facie case had not been made when plaintiff's reasonable accommodation request came four months after the disciplinary investigation against him began).  Thus, even if his April 29 email did constitute a protected activity, it would be "too little, too late" to establish a prima facie case.  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 90 (1st Cir. 2012) ("[w]hen an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late'") (internal quotations and citations omitted).

Finally, even assuming arguendo that Phalon has made a prima facie case of retaliation, for the reasons similar to those discussed above in Sections V.A.1 and V.A.2, he has failed to introduce evidence into the record upon which a reasonable jury

could conclude that either of his alleged protected activities motivated defendants in deciding to terminate his employment.[11]

Accordingly, the court grants defendants' Motion for Summary Judgment as to Counts Three and Four of Phalon's Complaint.

C.    FMLA Retaliation Claim

"Like ADA discrimination [and retaliation] claims, FMLA retaliation claims are also analyzed under the familiar McDonnell Douglas burden-shifting rubric.  Mancini, 411 F.Supp.3d at 256 (citing Roberts v. Health Ass'n, 308 F. App'x 568, 570 (2d Cir. 2009)). Similar to ADA retaliation claims, "[t]o make a prima facie showing of retaliation, [Phalon] must establish: (1) [he] exercised rights protected under the FMLA; (2) [he] was qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  Id.  Again, Phalon argues that his March 22 email about his knee surgery constituted a protected activity under the FMLA.  The court finds this argument unavailing.

Even the sole case Phalon cites in support of his argument dictates an opposite conclusion.  He relies on Coutard v. Municipal Credit Union, 848 F.3d 102, 111 (2d Cir. 2017), for the proposition that "an employee has provided sufficient notice to his employer if that notice indicates reasonably that the FMLA may apply."  Coutard, 848

---

[11] It is true, in a literal sense, that Phalon's April 29 email was considered by defendants before they officially terminated him.  But the evidence in the record shows the email did not impact their decision-making process.  It was not received until after the Friday meeting and after defendants had already made the decision to terminate Phalon.  Defs.' R. 56(a)1 Stmt at ¶ 89; Pl.'s R. 56(a)2 Stmt at ¶ 89 (arguing that the decision was not made at the 2:30 p.m. meeting on Friday, but that it was made "earlier in the day" and the "decision to terminate was merely reported to [Poenisch] in [the] 2:30 meeting").  Second, McLoughlin testified that, after reviewing the email, it "wasn't enough . . . to reverse the decision [he] had [already] made."  Dep. of Mark McLoughlin, Defs.' Ex. 11 at 136.

F.3d at 111.  Yet, crucially, Phalon neglects to include the first half of the quoted

sentence.  Stated in full, the Second Circuit held that "in the absence of a request for

additional information, an employee has provided sufficient notice to his employer if that

notice indicates reasonably that the FMLA may apply."  Id. (emphasis added).  Here,

additional information is exactly what defendants requested in response to Phalon's

email.  Defs.' Ex. 14 at 2-3.  Murray laid out in great detail all the steps Phalon would

need to take to request and take his leave.  She provided a link to initiate the claim;

discussed how he could "open a FML (family medical leave) claim;" and explained that

he would need to discuss his plans in greater detail with Dearth, his supervisor, to

ensure that the administrative tasks related to his leave were processed correctly.  Id.

Given that United States Department of Labor regulations require an employee to

"provide at least verbal notice sufficient to make the employer aware that the employee

needs FMLA-qualifying leave, and the anticipated timing and duration of the leave,"

Murray's response – along with her instructions on how Phalon could begin the process

of exercising his rights under the FMLA – were entirely reasonable.  Dighello v.

Thurston Foods, Inc., 307 F.Supp.3d 5, 14 (D. Conn. 2018) (quoting 29 C.F.R. §

825.302(c)) (emphasis added)).

    In circumstances like these – where the employer has provided an employee with

the information necessary to exercise their rights under the FMLA, but the employee

has not followed through with the process and formally requested leave – this Circuit

has held that the employee has not engaged in a protected activity under the FMLA.

See, e.g., Wahl v. County of Suffolk, 466 F. App'x 17, 20 (2d Cir. 2012) (plaintiff failed to

make a prima facie case of retaliation under the FMLA because "on several occasions

[he] was counseled that he could take child care leave under the FMLA, but he chose not to"); see also Muhleisen v. Wear Me Apparel LLC, 644 F.Supp.2d 375, 390 (S.D.N.Y. 2009) (plaintiff had failed to make a prima facie case when her employer provided her with the necessary paperwork to request leave under the FMLA, but plaintiff never filled it out); Vives v. New York City Dep't of Corr., No. 15-CV-06127, 2019 WL 1386738, at *18 (E.D.N.Y. Mar. 27, 2019) ("[a] plaintiff does not exercise her rights under the statute when she is informed that she can take leave under the FMLA but chooses not to do so").  These cases militate the same outcome here.  Phalon was provided the information he needed to make a formal request for FMLA leave.  He never did so.  Accordingly, he has not engaged in a protected activity under the statute, and has not made a prima facie case of retaliation.

Even assuming arguendo that Phalon has made a prima facie case of retaliation, for the reasons discussed above in Sections V.A.1 and V.B, he has failed to introduce evidence into the record upon which a reasonable jury could conclude that either of his alleged protected activities motivated defendants in deciding to terminate his employment.

Defendants' Motion for Summary Judgment is therefore granted as to Count Five of Phalon's Complaint.

## VI.   CONCLUSION

For the reasons discussed above, the court grants the defendants' Motion for Summary Judgment as to all of plaintiff's claims.  It also grants plaintiff's Motion for Leave to File Excess Pages nunc pro tunc, as well as Defendants' Motion to Seal. Exhibits 18, 19, 21, and 38 to defendants' Motion for Summary Judgment (Docs. Nos. 61-17, 61-18, 61-20, and 61-37) are hereby sealed, and defendants are ordered to file

within seven (7) days of this Ruling copies of exhibits 18 and 19 on the record with private details redacted.

**SO ORDERED.**

Dated at New Haven, Connecticut this 30th day of September 2021.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

36